## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BERNADETTE E. BINNS BLOUNT, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| SPRINT CORPORATION, GORDON M. BETHUNE, RAUL MARCELO CLAURE, MICHEL COMBES, PATRICK T. DOYLE, RONALD D. FISHER, JULIUS GENACHOWSKI, STEPHEN R. KAPPES, MICHAEL G. MULLEN, MASAYOSHI SON, and SARA MARTINEZ TUCKER, | |
| Defendants. | |

## COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Bernadette E. Binns Blount ("Plaintiff") brings this suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this complaint, Plaintiff, by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## INTRODUCTION

1.      Plaintiff brings this action against Sprint Corporation, ("Sprint" or the "Company"), and the Company's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below), for violations of Sections 20(a) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9"). Specifically, Defendants solicit stockholder approval in connection with the sale of the Company to affiliates of T-Mobile US, Inc. ("T-Mobile), through a proxy statement that omits material facts

1

necessary to make the statements therein not false or misleading.[1] Stockholders require this material information to decide whether to vote in favor of the proposed transaction.

2.      On April 29, 2018, the Company announced that it had entered into an agreement and plan of merger (the "Merger Agreement"), by which T-Mobile will acquire all of the outstanding shares of Sprint in an in an all-stock transaction at a fixed exchange ratio (the "Exchange Ratio") of 0.10256 T-Mobile shares for each Sprint share (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $146 billion.

3.      On July 30, 2018, Defendants issued a materially incomplete and misleading Form S-4 Registration Statement (the "Registration Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Registration Statement is materially misleading in that it fails to provide adequate disclosure of material information related to the Proposed Transaction.

4.      Specifically, the Registration Statement fails to disclose material information concerning the background of the Proposed Transaction and the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's respective financial advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and  Raine Group LLC ("Raine"). The omission of this material information renders the Registration Statement materially incomplete and misleading in violation of §§ 14(a) and 20(a) of the Exchange Act.

5.      For these reasons and as set forth in detail herein, the Individual Defendants, and the Company, have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the

---

[1] The Company and the Individual Defendants are referred to herein as "Defendants."

Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder

7.      Personal jurisdiction exists over each Defendant either because the Defendant is incorporated in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took effect under the laws in this District; (ii) Sprint is incorporated in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred under the laws of this District; (iv) relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

9.      Plaintiff is, and has been at all relevant times, the owner of shares of Sprint common stock.

10.     Defendant Gordon M. Bethune ("Bethune") has served as a director of Sprint since 2004.

11.     Defendant Raul Marcelo Claure ("Claure") has served as a director of Sprint since 2014.

12.     Defendant Michel Combes ("Combes") has served as a director of Sprint since 2018.

13.     Defendant Patrick T. Doyle ("Doyle") has served as a director of Sprint since 2016.

14.     Defendant Ronald D. Fisher ("Fisher") has served as a director of Sprint since 2013.

15.     Defendant Julius Genachowski ("Genachowski") has served as a director of Sprint since 2015.

16.     Defendant Stephen R. Kappes ("Kappes") has served as a director of Sprint since 2018.

17.     Defendant Michael G. Mullen ("Mullen") has served as a director of Sprint since 2013.

18.     Defendant Masayoshi Son ("Son") has served as a director of Sprint since 2013.

19.     Defendant Sara Martinez Tucker ("Tucker") has served as a director of Sprint since 2013.

20.     Defendants Bethune, Claure, Combes, Doyle, Fisher, Genachowski, Kappes, Mullen, Son, and Tucker, are collectively referred to as "Individual Defendants" and/or the "Board."

21.     Defendant Sprint is a communications company that offers a comprehensive range of wireless and wireline communications products and services designed to meet the needs of not only individual consumers, but also businesses, government subscribers, and resellers. Its services

are provided through its ownership of extensive wireless networks, an all-digital global wireline network and a Tier 1 internet backbone. Sprint offers wireless and wireline services to subscribers in all 50 states, Puerto Rico and the United States Virgin Islands under the Sprint corporate brand, which includes its retail brands of Sprint®, Boost Mobile®, Virgin Mobile® and Assurance Wireless® on Sprint's wireless networks utilizing various technologies including 3G CDMA and 4G LTE. The Company, incorporated in Delaware, is headquartered at 6200 Sprint Parkway Overland Park, Kansas 66251. Sprint's common stock trades on the New York Stock Exchange under the symbol "S."

## OTHER RELEVANT ENTITIES

22.     T-Mobile is a Delaware corporation formed in 2013 through the combination of T-Mobile USA and MetroPCS Communications, Inc. T-Mobile's advanced nationwide 4G LTE network provides wireless services to 74.0 million customers as of March 31, 2018. T-Mobile provides service, devices and accessories across its flagship brands, T-Mobile and MetroPCS, and through its owned and operated retail stores, third-party distributors and websites. The Company is headquartered at 12920 SE 38th Street Bellevue, Washington 98006-1350. T-Mobile's common stock trades on the NASDAQ under the symbol "TMUS."

23.     Huron Merger Sub LLC is a wholly owned subsidiary of T-Mobile and was formed on April 26, 2018, solely for the purpose of engaging in the transactions contemplated by the Merger Agreement.

24.     Superior Merger Sub Corporation is a wholly owned subsidiary of T-Mobile and was formed on April 26, 2018, solely for the purpose of engaging in the transactions contemplated by the Merger Agreement.

## FURTHER SUBSTANTIVE ALLEGATIONS

**The Merger Process**

25.     In April 2017, the members of the Sprint board of directors who were deemed to be independent and not affiliated with SoftBank (Gordon M. Bethune, Patrick Doyle, Julius Genachowski, Admiral Michael G. Mullen and Sara Martinez Tucker) (the "Independent Sprint directors") held a meeting to discuss a possible business combination transaction between Sprint and T-Mobile.

26.     The prospect a possible business combination transaction between the two telecom giants quickly spilled into the public sphere, and in mid-May 2017, media stories reported that Sprint and T-Mobile were engaging in discussions regarding a possible business combination.

27.     During a May 23, 2018 meeting between representatives of T-Mobile, Deutsche Telekom, Sprint and SoftBank, the parties discussed that, given the market rumors of a possible transaction and the potential impact of such rumors on each company's stock price, the parties consider a stock-for-stock merger with a fixed exchange ratio reflecting the intrinsic valuations of each of Sprint and T-Mobile.

28.     While these discussions were ongoing, representatives of SoftBank and Sprint were simultaneously meeting with representatives of a public company ("Company A") and representatives of one of Company A's largest shareholders ("Shareholder X") to discuss a possible business combination between Sprint and Company A.

29.     In late June 2017, SoftBank, Sprint, Company A and another public company ("Company B") entered into a nondisclosure agreement in connection with discussions of a potential strategic transaction.

30.     In July 2017, SoftBank and Shareholder X entered into a nondisclosure agreement in connection with discussions of a possible business combination between Sprint and Company

A, and Sprint subsequently became a party to such nondisclosure agreement. Later that same month, representatives of Sprint, SoftBank, Company A and Shareholder X met to discuss a possible business combination between Sprint and Company A.

31.     Sprint's on-going discussions with T-Mobile, Deutsche Telekom, Company A, and Company B were reviewed by the Sprint board of directors periodically during the period from May 2017 to early September 2017.

32.     In September 2017, the Sprint board of directors established the Sprint independent committee (the "Independent Committee"), consisted solely of all of the independent Sprint directors, each of whom was deemed to be independent and not affiliated with SoftBank, in light of SoftBank's ownership of a majority of the outstanding Sprint common stock and the potential for related party transactions between Sprint and SoftBank in connection with the proposed transaction. The Independent Committee later engaged Centerview Partners LLC ("Centerview") to act as its financial advisor connection with its review and evaluation of possible transactions with T-Mobile and other parties.

33.     Following the creation of the Independent Committee, the sale process continued apace.

34.     On November 1, 2017, following extensive discussions and negotiations between the parties, at the direction of the T-Mobile board of directors, representatives of T-Mobile and Deutsche Telekom sent a proposal to Sprint and SoftBank to seek to determine whether it would be possible to reach agreement on the principal terms for a stock-for-stock business combination of T-Mobile and Sprint. The proposal also set forth governance terms, including board composition and the initial chief executive officer of the combined company, terms of a proposed amended and restated stockholders' agreement and voting and proxy agreement.

35.     The following day, representatives of Sprint and SoftBank sent a revised proposal that included a revised exchange ratio and revisions to certain of the governance proposals, capital structure terms and other terms outlined by T-Mobile and Deutsche Telekom that were more favorable to Sprint and SoftBank.

36.     The Registration Statement fails to disclose the exchange ratio contemplated in either the initial proposal or the revised proposal.

37.     Three days later, on November 4, 2017, T-Mobile and Sprint issued a joint press release announcing that they had ended merger discussions after being unable to reach agreement, including with respect to the exchange ratio, certain governance matters and financing for the proposed transaction. Later that same month, representatives of T-Mobile, Deutsche Telekom, Sprint and SoftBank held discussions regarding whether it would be productive to re-engage in merger discussions.

38.     While negotiations between T-Mobile and Sprint had collapsed, albeit briefly, Sprint's interest in a strategic transaction continued. During the period from November 2017 to February 2018, representatives of Sprint and representatives of a public company ("Company C") discussed a possible business combination between Sprint and Company C, and in December 2017, Sprint and Company C entered into a nondisclosure agreement in connection with these discussions.

39.     On February 25, 2018, representatives of Sprint and representatives of Company C met to discuss a possible business combination between Sprint and Company C.

40.     During this same period of time, Sprint re-engaged in merger discussions with T-Mobile. In late January and early February 2018, representatives of Sprint and SoftBank and representatives of T-Mobile and Deutsche Telekom discussed the possibility of re-engaging in

discussions regarding a possible business combination between Sprint and T-Mobile. Central to these discussions were the parties competing viewpoints on the exchange ratio for a stock-for-stock business combination transaction. T-Mobile and Deutsche Telekom indicated that an exchange ratio equivalent to 10.5 shares of Sprint common stock for each share of T-Mobile common stock (or approximately 0.09524 of a share of T-Mobile common stock for each share of Sprint common stock) was appropriate, while representatives of Sprint and SoftBank argued for an exchange ratio equivalent to 9 shares of Sprint common stock for each share of T-Mobile common stock (or approximately 0.11111 of a share of T-Mobile common stock for each share of Sprint common stock).

41.     These discussions led to an in-person meeting between representatives of T-Mobile, Deutsche Telekom, Sprint and SoftBank on March 26 and 27, 2018 to discuss a possible strategic transaction. At the meeting, representatives of T-Mobile and Deutsche Telekom indicated that they would be prepared to proceed with negotiations at an exchange ratio equivalent to 10 shares of Sprint common stock for each share of T-Mobile common stock (or 0.10000 of a share of T-Mobile common stock for each share of Sprint common stock). Following further negotiations, the parties agreed, subject to further due diligence, to engage in further discussions and planning for a stock-for-stock merger on the proposed basis of an exchange ratio equivalent to 9.75 shares of Sprint common stock for each share of T-Mobile common stock (or 0.10256 of a share of T-Mobile common stock for each share of Sprint common stock).

42.     Shortly thereafter, representatives of T-Mobile communicated to Sprint a term sheet setting forth certain proposed key transaction. The term sheet contemplated an exchange ratio equivalent to 9.75 shares of Sprint common stock for each share of T-Mobile common stock (0.10256 of a share of T-Mobile common stock for each share of Sprint common stock).

43.     With the proposed structure in place, representatives of T-Mobile and Sprint continued to conduct due diligence and engage in discussions regarding, amongst other topics, a proposed business plan, network plan and capital structure for the combined company, due diligence matters, regulatory issues, the treatment of current related-party agreements between Sprint and SoftBank, board and committee designation rights at the combined company, veto rights for certain actions, a matching right for a sale of the combined company, a right to acquire stock of the combined company and a right of first refusal for sales of combined company common stock by Deutsche Telekom.

44.     These negotiations came to an end on April 27, 2018, when representatives of T-Mobile and Deutsche Telekom, and representatives of Sprint and SoftBank, reached an agreement as to the remaining issues related to the merger, and finalized the transaction documentation, including the business combination agreement, the amended and restated stockholders' agreement.

45.     On April 29, 2018, the Sprint board of directors, including all of the members of the Sprint independent committee, held a meeting to review the final transaction terms, and consider final drafts of the business combination agreement and the other agreements to be entered into in connection with the business combination transaction. Representatives of Centerview presented Centerview's financial analyses in connection with the transaction and rendered Centerview's oral opinion to the Sprint independent committee, which was subsequently confirmed by delivery of a written opinion, that the exchange ratio provided for pursuant to the business combination agreement was fair, from a financial point of view, to the holders of Sprint common stock. Following this presentation, Sprint independent committee then determined that the business combination agreement and the transactions contemplated by the agreement were fair to, and in the best interests of, Sprint and the Sprint minority stockholders, and unanimously

resolved to recommend that (1) the business combination agreement be submitted to the Sprint board of directors, (2) the Sprint board of directors approve and declare advisable the business combination agreement and the transactions contemplated thereby, (3) the Sprint board of directors submit the business combination agreement to Sprint's stockholders for adoption and (4) the Sprint board of directors recommend adoption of the business combination agreement to Sprint's stockholders.

46.     At this same meeting representatives of Raine and J.P. Morgan rendered their respective oral opinions, subsequently confirmed by the submission of their respective written opinions dated April 29, 2018, that the exchange ratio pursuant to the business combination agreement was fair, from a financial point of view, to the holders of Sprint common stock as of immediately prior to the HoldCo mergers, taking into account the merger. Shortly thereafter, the Sprint board of directors unanimously determined that the business combination agreement and the transactions contemplated by the agreement were fair to, and in the best interests of, Sprint and its stockholders, approved and declared advisable the business combination agreement and the transactions contemplated thereby, resolved to submit the business combination agreement to Sprint's stockholders for adoption and resolved to recommend adoption of the business combination agreement to Sprint's stockholders.

47.     That same day, T-Mobile, Sprint, Deutsche Telekom, SoftBank and certain of their affiliates executed the business combination agreement. Following the execution of the business combination agreement, T-Mobile and Sprint issued a joint press release announcing entry into the business combination agreement.

**The Merger Announcement**

48.     In a press release dated April 29, 2018, Sprint announced that it had entered into a Merger Agreement with T-Mobile pursuant to which T-Mobile will acquire all of the outstanding

shares of Sprint in an all-stock transaction at a fixed exchange ratio of 0.10256 T-Mobile shares for each Sprint share.

49.     The press release states in pertinent part:

April 29, 2018 12:00 PM EDT — BELLEVUE, Wash. & OVERLAND PARK, Kan. — (Business Wire) — T-Mobile US (NASDAQ: TMUS) and Sprint Corporation (NYSE: S) today announced they have entered into a definitive agreement to merge in an all-stock transaction at a fixed exchange ratio of 0.10256 T-Mobile shares for each Sprint share or the equivalent of 9.75 Sprint shares for each T-Mobile US share. Based on closing share prices on April 27, this represents a total implied enterprise value of approximately $59 billion for Sprint and approximately $146 billion for the combined company. The new company will have a strong closing balance sheet and a fully funded business plan with a strong foundation of secured investment grade debt at close.

The combined company will be named T-Mobile, and it will be a force for positive change in the U.S. wireless, video, and broadband industries. The combination of spectrum holdings, resulting network scale, and expected run rate cost synergies of $6+ billion, representing a net present value (NPV) of $43+ billion will supercharge T-Mobile's Un-carrier strategy to disrupt the marketplace and lay the foundation for U.S. companies and innovators to lead in the 5G era.

The New T-Mobile will have the network capacity to rapidly create a nationwide 5G network with the breadth and depth needed to enable U.S. firms and entrepreneurs to continue to lead the world in the coming 5G era, as U.S. companies did in 4G. The new company will be able to light up a broad and deep 5G network faster than either company could separately. T-Mobile deployed nationwide LTE twice as fast as Verizon and three times faster than AT&T, and the combined company is positioned to do the same in 5G with deep spectrum assets and network capacity.

The combined company will have lower costs, greater economies of scale, and the resources to provide U.S. consumers and businesses with lower prices, better quality, unmatched value, and greater competition. The New T-Mobile will employ more people than both companies separately and create thousands of new American jobs.

Following closing, the new company will be headquartered in Bellevue, Wash., with a second headquarters in Overland Park, Kan. John Legere, current President and Chief Executive Officer of T-Mobile US and the creator of T-Mobile's successful Un-carrier strategy, will serve as Chief Executive Officer, and Mike Sievert, current Chief Operating Officer of T-Mobile, will serve as President and Chief Operating Officer of the combined company. The remaining members of the new management team will be selected from both companies during the closing

period. Tim Höttges, current T-Mobile US Chairman of the Board, will serve as Chairman of the Board for the new company. Masayoshi Son, current SoftBank Group Chairman and CEO, and Marcelo Claure, current Chief Executive Officer of Sprint, will serve on the board of the new company.

"This combination will create a fierce competitor with the network scale to deliver more for consumers and businesses in the form of lower prices, more innovation, and a second-to-none network experience — and do it all so much faster than either company could on its own," said John Legere. "As industry lines blur and we enter the 5G era, consumers and businesses need a company with the disruptive culture and capabilities to force positive change on their behalf."

"The combination of these two dynamic companies can only benefit the U.S. consumer. Both Sprint and T-Mobile have similar DNA and have eliminated confusing rate plans, converging into one rate plan: Unlimited," said Marcelo Claure. "We intend to bring this same competitive disruption as we look to build the world's best 5G network that will make the U.S. a hotbed for innovation and will redefine the way consumers live and work across the U.S., including in rural America. As we do this, we will force our competitors to follow suit, as they always do, which will benefit the entire country. I am confident this combination will spur job creation and ensure opportunities for Sprint employees as part of a larger, stronger combined organization, and I am thrilled that Kansas City will be a second headquarters for the merged company."

### Creating #5GforAll — the Only Broad and Deep 5G Nationwide Network

It is critically important that America and American companies lead in the 5G era. Early U.S. leadership in 4G fueled a wave of American innovation and entrepreneurship that gave rise to today's global mobile Internet leaders, creating billions in economic value and job growth. America's early 4G leadership is credited with creating 1.5 million jobs and adding billions to the U.S. GDP. With 5G, the stakes are even higher — because 5G will be even more transformational.

Only the combined company will have the network capacity required to quickly create a broad and deep 5G nationwide network in the critical first years of the 5G innovation cycle — the years that will determine if American firms lead or follow in the 5G digital economy. With Sprint's expansive 2.5 GHz spectrum, T-Mobile's nationwide 600 MHz spectrum, and other combined assets, the New T-Mobile plans to create the highest capacity mobile network in U.S. history. Compared to T-Mobile's network today, the combined company's network is expected to deliver 15x faster speeds on average nationwide by 2024, with many customers experiencing up to 100x faster speeds than early 4G.

Neither company standing alone can create a nationwide 5G network with the breadth and depth required to fuel the next wave of mobile Internet innovation in the U.S. and answer competitive challenges from abroad.

Neither can AT&T and Verizon in the near term, even though they will still respectively own 34% and 172% more spectrum than the combined company. Even with their vast resources, AT&T and Verizon cannot rapidly build nationwide 5G and their planned 5G networks will only be available sporadically in just a handful of very limited areas. To build nationwide 5G, they either have to kick current customers off LTE, which would take years, or use a type of spectrum (millimeter wave) that can only carry a signal 2,000 feet from a cell site — versus multiple miles for other spectrum — making it nearly impossible for either of them to create a truly nationwide 5G network quickly.

Ubiquitous high-speed 5G service and Internet of Things ("IoT") capabilities will ignite innovation across industries and create the conditions for U.S. firms and innovators to lead the globe in the 5G era.

"Going from 4G to 5G is like going from black and white to color TV," added Claure. "It's a seismic shift — one that only the combined company can unlock nationwide to fuel the next wave of mobile innovation."

5G for All will unleash incredible benefits and capabilities for consumers and businesses. Imagine, for example, augmented reality heads-up displays that see everything you do, and provide real-time cloud-driven information about the people and objects around you. Imagine never losing anything again because low-cost sensors with decade long battery life are embedded in everything you own. Imagine an earpiece providing real-time translation as a friend speaks to you in another language. Imagine environmental sensors in infrastructure and for agriculture having a profound impact on productivity.

**Shifting the Un-carrier Strategy Into Overdrive — Reducing Prices and Driving More Competition**

The new company expects prices to drop as competition heats up. The New T-Mobile will have lower costs, greater economies of scale, and unprecedented network capacity — a winning combination that should make wireless, and adjacent industries like cable and broadband, more affordable for everyone.

The combination will dramatically accelerate T-Mobile's successful Un-carrier strategy, which is built around listening to customers and solving their pain points. It will also leverage Sprint's incredible spectrum assets and strong DNA.

The deal will create more competition and unmatched value for customers across the country. And, existing T-Mobile and Sprint customers will benefit from increased speeds, coverage, and performance as the two companies' networks combine.

Wireless, broadband, and video markets are rapidly converging. AT&T is now the largest TV provider in the country. Comcast added more wireless phone customers last year than AT&T and Verizon combined, and Charter is launching wireless this year. And, more than 1 in 10 Americans (12%) use wireless as their only Internet or broadband connection, freeing themselves from the grip of the traditional, uncompetitive in-home broadband providers.

"This isn't a case of going from 4 to 3 wireless companies — there are now at least 7 or 8 big competitors in this converging market. And in 5G, we'll go from 0 to 1. Only the New T-Mobile will have the capacity to deliver real, nationwide 5G," added Legere. "We're confident that, once regulators see the compelling benefits, they'll agree this is the right move at the right time for consumers and the country."

In this rapidly converging marketplace, the new company will bring more choice and competition — for all consumers, including three key underserved areas:

·Rural communities. Rural Americans seldom have a choice of more than one or two wireless, broadband, or cable providers. The New T-Mobile will end that with increased reach and plans to open hundreds of new stores in rural communities, creating thousands of new jobs. Millions of Americans in rural communities will have more choice and competition, where they may have none today.

·Broadband. 51% of Americans have only one high-speed broadband option — no choice at all! The combined company will create a viable alternative for millions by enabling mobile connections that rival broadband, driving prices lower and improving service.

·Business and government wireless services. Today, Verizon and AT&T dominate this category with 4x more customers than Sprint and T-Mobile added together. With its assets and capabilities, the new company will unlock real competition for business and government customers.

**Driving Significant U.S. Job Growth**

From the first day Sprint and T-Mobile combine and every year thereafter, the new company will employ more people in the U.S. than both companies would separately. More than 200,000 people will work on behalf of the combined company in the U.S. at the start.

And, the New T-Mobile plans to invest up to $40 billion in its new network and business in the first three years alone, a massive capital outlay that will fuel job growth at the new company and across related sectors. This is 46% more than T-Mobile and Sprint spent combined in the past three years.

This combination will also force AT&T, Charter, Comcast, Verizon, and others to make investments of their own to compete, driving billions more in accelerated investment.

Five years ago, T-Mobile merged with MetroPCS to compete in the 4G era — a transaction that has resulted in substantial job growth. Three times the number of people work on MetroPCS today compared to the time of the acquisition in 2013. With that track record, the New T-Mobile will accelerate long-term economic stimulus for the U.S. in the 5G era — ultimately leading to the creation of thousands of American jobs and supporting business opportunities for the U.S. economy.

5G is expected to create 3 million new U.S. jobs and $500 billion in economic growth by 2024, according to a report from CTIA, and the combined company will be a catalyst in driving that massive economic stimulus.

**Transaction Details and Financial Profile**

The new company expects to create substantial value for T-Mobile and Sprint shareholders through an expected $6+ billion in run rate cost synergies, representing a net present value (NPV) of $43+ billion, net of expected costs to achieve such cost synergies. This transaction will also enhance the financial position of the combined company. Highlights include:

· Pro Forma 2018E Service Revenue(1) of $53-57 billion

· Pro Forma 2018E Adjusted EBITDA(1),(2) of $22-23 billion

· Pro Forma 2018E Adjusted EBITDA(1),(2) Margin of 40-42% with a longer-term target of 54-57%

· Pro Forma 2018E Net Debt(3) of $63-65 billion with a streamlined single-silo corporate debt structure

· Fully funded business plan with significant liquidity at close

The Boards of Directors of T-Mobile and Sprint have approved the transaction. Deutsche Telekom and SoftBank Group are expected to hold approximately 42% and 27% of diluted economic ownership of the combined company, respectively, with the remaining approximately 31% held by the public. The Board will consist of 14 directors, 9 nominated by Deutsche Telekom and 4 nominated by SoftBank Group, including Masayoshi Son, Chairman and CEO of SoftBank Group, and Marcelo Claure, CEO of Sprint. John Legere, CEO of the New T-Mobile, will also serve as a director. Upon consummation of the transaction, the combined company is expected to trade under the (TMUS) symbol on the NASDAQ.

The new company will have some of the most iconic brands in wireless — T-Mobile, Sprint, MetroPCS, Boost Mobile, Virgin Mobile — and will determine brand strategy after the transaction closes.

The transaction is subject to customary closing conditions, including regulatory approvals. The transaction is expected to close no later than the first half of 2019.

**The Registration Statement Omits Material Information**

50.     On July 30, 2018, T-Mobile filed the Registration Statement with the SEC.  On October 1, 2018, an amended S-4 was filed. As alleged below and elsewhere herein, the Registration Statement contains material misstatements and omissions of fact that must be cured to allow Sprint's stockholders to render an informed decision with respect to the Proposed Transaction.

51.     Specifically, as discussed below, the Registration Statements omits material information regarding the sale process and the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisors, J.P. Morgan and Raine. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to Sprint stockholders. Accordingly, Sprint stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

*Material Omissions Concerning the Non-Disclosure Agreements:*

52.     With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Registration Statement indicates that the Company entered into non-disclosure agreements with a number of potentially interested parties. However, the nature and extent of these agreements are not disclosed in the Registration Statement. Specifically, details regarding the terms of these non-disclosure agreements, including whether

they contain standstill and/or "don't ask, don't waive" ("DADW") provisions that prohibit the counterparties from making an unsolicited superior proposal to Sprint are worryingly absent from the Registration Statement.

53.     The Registration Statement notes that in late June 2017, SoftBank, Sprint, Company A, and Company B entered into a nondisclosure agreement ("NDA") in connection with discussions of a potential strategic transaction.  The Registration Statement also notes that one month later, SoftBank and Shareholder X entered into an NDA in connection with discussions of a possible business combination between Sprint and Company A, and Sprint subsequently became a party to such nondisclosure agreement. Following the execution of the NDAs, representatives of Sprint, SoftBank, Raine, McKinsey, Company A and Shareholder X met to discuss a possible business combination involving Sprint and Company A. Later, in December 2017, Sprint and Company C entered into an NDA in connection with discussions surrounding a possible business combination involving Sprint and Company C.

54.     The complete absence of information regarding terms of the NDAs entered into by these entities is troubling. Without further information regarding the presence of standstill provisions or DADW provisions, including whether those provisions had fallen away upon the execution of the Merger Agreement or were still in effect, Sprint stockholders are unable to properly evaluate the ability of these parties that earlier expressed interest in a potential strategic transaction to offer them a better deal. If the NDAs contained standstill provisions or DADW provisions, then those bidders could only make a superior proposal by breaching the agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly.

55.     Thus, the omission of this information renders the descriptions of the NDAs the Company entered into materially incomplete and misleading, as the failure to disclose the existence of standstill and DADW provisions creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. Clearly, any reasonable Sprint shareholder would deem the fact that the most likely potential topping bidder in the marketplace may be precluded from making a superior offer as significant information.

56.     Accordingly, without further information regarding the terms of the NDAs, the Company's stockholders are being misled into assuming that these other entities, which were actively interested in acquiring the Company, and had already elected to submit a bid to acquire the Company, could make an offer to acquire the Company if they so choose – when they may be contractually precluded from doing so. It is therefore vital that Sprint stockholders are provided with the material information regarding the terms of the NDAs.

### Material Omissions Concerning the Financial Advisors' Financial Analyses:

57.     Sprint engaged both Raine and J.P. Morgan to render financial advisory and investment banking services, including providing an opinion to the Board as to the fairness, from a financial point of view, to the holders of Sprint common stock of the merger consideration that would be received if the Proposed Transaction is approved. However, the description in the Registration Statement of J.P. Morgan's and Raine's respective fairness opinions and the underlying analyses omits key inputs and assumptions of Sprint underlying these analyses. Without this information, as described below, Sprint public stockholders are being misled as to what weight, if any, to place on the financial advisors respective fairness opinions in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to Sprint stockholders.

58.     Specifically, the Registration Statement discloses that Raine conducted a discounted cash flow ("DCF") analysis of Sprint's projected unlevered free cash flows based on the Sprint management Sprint forecasts and the adjusted Sprint management Sprint forecasts for the calendar years 2018 and 2022. However, with respect to respect to Raine's DCF analysis, the Registration Statement fails to disclose: (i) Sprint's projected unlevered free cash flows based on Spring management Spring forecasts; (ii) the specific inputs and assumptions underlying the weighted average cost of capital ("WACC") ranging from 7.00% to 8.00%; and (iii) Sprint's net operating losses ("NOLs") which were incorporated into the analysis. The failure to provide Sprint's projected unlevered free cash flows is particularly troubling here. The Registration Statement disclosed two separate sets of financial projections for Sprint, but failed to disclose values for Unlevered Free Cash Flow in either forecast. Instead stockholders were only provided levered free cash flow and there was no line item detail for levered free cash flow. Accordingly, not only do Sprint stockholders lack any indication as to the projections that are being discounted, but also lack the line items that could ostensibly be used to calculate the missing metric.

59.     Similarly, J.P. Morgan also performed a DCF Analysis of Sprint, utilizing the Sprint's unlevered free cash flows for the calendar years 2018 through 2022. As discussed above, only levered free cash flow was disclosed in the Sprint forecasts, thereby rendering the present analysis both incomplete and misleading. Furthermore, J.P. Morgan's DCF Analysis also omits: (i) the specific inputs and assumptions underlying the WACC ranging from 6.50% to 7.50%; and (iii) Sprint's net operating losses ("NOLs") which were incorporated into the analysis.

60.     These same issues can be found in the other DCF analyses that Raine and J.P. Morgan conducted. Raine performed a DCF Analysis of T-Mobile's projected unlevered free cash flows based on the T-Mobile management T-Mobile forecasts for the calendar years 2018 through

2022. However, the Registration Statement omits to disclose: (i) basis for selecting assumed perpetuity growth rates ranging from 0.0% to 1.00%; (ii) the specific inputs and assumptions underlying the WACC ranging from 6.50% to 7.50%; and (iii) T-Mobile's NOLs which were incorporated into the analysis.

61.    J.P. Morgan's DCF analysis of T-Mobile was similarly flawed. The Registration Statement provides that J.P. Morgan performed a DCF Analysis of T-Mobile was based on T-Mobile's unlevered free cash flows for the calendar years 2018 through 2022. However, the Registration Statement omits: (i) the specific inputs and assumptions underlying the WACC ranging from 6.50% to 7.50%; and (ii) T-Mobile's NOLs which were incorporated into the analysis.

62.    Finally, Raine also performed a discounted cash flow analysis of the combined company based on the Sprint management Sprint forecasts, the adjusted Sprint management Sprint forecasts, the T-Mobile management T-Mobile forecasts and the estimated synergies. However, the Registration Statement omits to disclose the annual synergy figures or the value of Sprint's unlevered free cash flows as utilized in the analyses.

63.    With regard to many of the other analyses performed by both Raine and J.P. Morgan, the Registration Statement omits key inputs and assumptions of Sprint underlying these analyses.

64.    With regard to Raine's Precedent Transactions Analysis, the Registration Statement fails to disclose the multiples of each of the seven selected precedent transactions.

65.    With respect to Raine's Analysts' Price Targets, Raine reviewed equity research analysts' 12-month share price targets for Sprint common stock and T-Mobile common stock.

However, the Proxy fails to disclose the names of the research firms and their respective price targets, nor does it disclose the mean and median price targets for T-Mobile and Sprint, separately.

66.     With respect to J.P. Morgan's own analyses of the Analyst Price Targets for both Sprint and T-Mobile, the Proxy fails to disclose the analysts' price targets for either Sprint or T-Mobile.

67.     Finally, with respect to J.P. Morgan's Selected Transaction Analysis, J.P. Morgan examined selected transactions with respect to seven selected companies engaged in businesses analogous to Sprint. However, the Proxy fails to disclose the multiples of each of the selected transactions.

68.     When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company, and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if Sprint stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

69.     Without such omitted information, Sprint stockholders cannot evaluate for themselves whether the financial analyses performed by either financial advisor were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other

words, full disclosure of the omitted information identified above is required in order to ensure that stockholders can evaluate the extent to which the Financial Advisors' opinions and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

### Material Omissions Concerning Raine's Potential Conflicts of Interest

70.     In addition to the allegations raised above concerning Raine's financial analyses, the Registration Statement fails to disclose the full extent of Raine's relationship with SoftBank. As disclosed on page 131 of the Registration Statement:

> In the two years prior to the date of its opinion, Raine frequently provided financial advisory and investment banking services to SoftBank, the majority equity holder of Sprint, which are unrelated to the merger, for which Raine received customary compensation. Further, SoftBank previously engaged Raine to act as SoftBank's financial advisor in connection with its consideration of a potential transaction between Sprint and T-Mobile, including a potential merger, which engagement has been completed and for which Raine received customary compensation. Raine is not entitled to receive any further compensation pursuant to such engagement in connection with the completion of the merger transactions. Entities affiliated with SoftBank beneficially own a minority interest in Raine, and affiliates of SoftBank and Raine are investors in investment funds managed by Raine and SoftBank, respectively.

71.     SoftBank is a holding company that engages in a range of businesses in the information industry, including mobile communications, broadband infrastructure, fixed-line telecommunications and internet culture. In light of SoftBank's ownership of a majority of the outstanding Sprint common stock, a full disclosure of Raine's compensation and all potential conflicts is required due to the central role played by Raine in the evaluation, exploration, selection, and implementation of strategic alternatives. That is especially true where, here, Raine acted as lead financial advisor to Sprint, and J.P. Morgan was engaged as an additional financial advisor to Sprint. Instead, the Registration Statement omits to disclose: (i) the amount of "customary compensation" Raine and its affiliates received in connection with its commercial or investment banking relationships with SoftBank and affiliates of SoftBank; (ii) details of the minority interest

that entities affiliated with SoftBank beneficially own in Raine, and (iii) detail about SoftBank's and Raine's investments in investment funds managed by each other.

72.     This information is clearly material. A financial advisor's own proprietary financial interest in a transaction must be carefully considered when assessing how much credence to give its analyses and opinions. Here, reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the merger to the shareholders, might have.  Accordingly, the Registration Statement must disclose the full extent of Raine's relationship with SoftBank as without full disclosure of the past work done by Raine for SoftBank in the last two years, and any fees received for such work, stockholders may be materially misled as to Raine's potential conflicts of interest.

73.     Based on the foregoing, the Registration Statement violates Section 14(a) of the Exchange Act and applicable SEC regulations by materially misleading Sprint stockholders. Sprint public shareholders lack critical information necessary to evaluate the Proposed Transaction.

74.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

**CLAIMS FOR RELIEF**

**COUNT I**

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

75.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

76.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

77.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy statement communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

78.     Furthermore, Item 1015 of Regulation M-A requires "[a]ny report, opinion or appraisal relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the transaction to the issuer or affiliate or to security holders who are not affiliates" to "[d]escribe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between: (i) The outside party, its affiliates, and/or unaffiliated representative; and (ii) The subject company or its affiliates." 17 CFR 229.1015.

79.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

80.     Here, Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, amongst other things: (i) the background of the transaction; (ii) the valuation analyses

performed by the Company's financial advisors, in support of their fairness opinions; and (iii) the potential conflicts of interest involving the financial advisors.

81.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to Sprint common stockholders although they could have done so without extraordinary effort.

82.     The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement notes that the financial advisors reviewed and discussed their financial analyses with the Board, and further states that the Board considered the financial analyses provided by the financial advisors, as well as their respective fairness opinions and the assumptions made and matters considered in connection therewith.

83.     Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement,

rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the financial advisors' analyses in connection with their receipt of the fairness opinion, question the advisors as to the derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement, and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

84.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

85.     Sprint is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

86.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff and Sprint stockholders, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Sprint stockholders have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Sprint stockholders be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**Against the Individual Defendants for
Violations of § 20(a) of the 1934 Act**

87.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

88.     The Individual Defendants acted as controlling persons of Sprint within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Sprint and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

89.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Registration Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

90.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the creation of the Registration Statement.

91.     The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

92.     By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

93.     As set forth above, the Individual Defendants had the ability to exercise control over, and did control, a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, Plaintiff is threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

a) declaring that the Registration Statement is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b) preliminarily and permanently, enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Registration Statement;

c) to the extent the Proposed Transaction is consummated prior to the Court's entry of a final judgment, awarding Plaintiff rescissory damages against the Individual Defendants, including, but not limited to, pre-judgment and post-judgment interest;

d) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

e) granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 24, 2018

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE  19801
(302) 984-3800
Email: bbennett@coochtaylor.com
*Attorneys for Plaintiff*

**OF COUNSEL:**
**LEVI & KORSINSKY LLP**
Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
1101 30th Street, N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
Email: denright@zlk.com
        etripodi@zlk.com

*Attorneys for Plaintiff*